**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FRIENDS OF THE WILD SWAN, a non-profit organization; THE SWAN VIEW COALITION, a non-profit organization,

*Plaintiffs-Appellants*,

v.

CHIP WEBER, in his official capacity as Forest Supervisor for the Flathead National Forest; VICKI CHRISTIANSEN, in her official capacity as Acting Regional Forester for the United States Forest Service, Region One; UNITED STATES FOREST SERVICE, an agency of the United States Department of Agriculture; DANIEL M. ASHE, in his official capacity as Director of the U.S. Fish & Wildlife Service; U.S. FISH & WILDLIFE SERVICE, an agency of the United States Department of the Interior,

*Defendants-Appellees*.

No. 13-35817

D.C. No.
9:12-cv-00029-DLC-JCL

FRIENDS OF THE WILD SWAN, a non-profit organization; THE SWAN VIEW

No. 13-35819

COALITION, a non-profit
organization,
                *Plaintiffs-Appellants*,

                v.

VICKI CHRISTIANSEN, in her official
capacity as Acting Regional Forester
for the United States Forest Service,
Region One; CHIP WEBER, in his
official capacity as Forest Supervisor
for the Flathead National Forest;
UNITED STATES FOREST SERVICE, an
agency of the United States
Department of Agriculture; DANIEL
M. ASHE, in his official capacity as
Director of the U.S. Fish & Wildlife
Service; U.S. FISH & WILDLIFE
SERVICE, an agency of the United
States Department of the Interior,
                *Defendants-Appellees*.

D.C. No.
9:12-cv-00059-
DLC-JCL


OPINION

Appeal from the United States District Court
for the District of Montana
Dana L. Christensen, Chief District Judge, Presiding

Argued and Submitted
April 9, 2014—Seattle, Washington

Filed September 24, 2014

Before: Michael Daly Hawkins, Johnnie B. Rawlinson,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Hawkins

## SUMMARY[*]

### Environmental Law

The panel affirmed the district court's denial of two preliminary injunctions in plaintiff environmental groups' challenges to the United States Forest Service's approval of two neighboring logging projects in Montana's Flathead National Forest.

The panel held that plaintiffs failed to demonstrate an imminent injury in the absence of injunctive relief with respect to their National Environmental Policy Act claim that the Environmental Assessments prepared by the United States Forest Service failed to analyze sufficiently the cumulative impact of the two logging projects in the same segment of the Flathead River's South Fork at the same time. The panel also rejected plaintiffs' related claim under NEPA that the Forest Service should have considered the cumulative impact in determining whether or not to prepare a full-blown Environmental Impact Statement.

The panel also held that plaintiffs neither showed a likelihood of success on the merits nor raised serious

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

questions on the merits of their National Forest Management Act claims that (1) the logging projects violate a standard set forth in the Northern Rockies Lynx Management Direction that prohibits logging and burning that reduces snowshoe hare, a favorite prey of the lynx; and (2) the Forest Service's habitat analysis did not account for the fisher, a member of the weasel family.

Finally, the panel held that plaintiffs neither showed a likelihood of success on the merits nor raised serious questions on the merits of their Endangered Species Act claim. Specifically, the panel rejected plaintiffs' argument that, when evaluating the effects of the action on potentially affected species, the Forest Service defined too narrowly the "action area" for the potentially affected species of the lynx, grizzly bear, and bull trout.

**COUNSEL**

Matthew K. Bishop (argued), Western Environmental Law Center, Helena, Montana, for Plaintiffs-Appellants.

Michael W. Cotter, United States Attorney, and Mark Steger Smith, Assistant United States Attorney, District of Montana, Billings, Montana; Christine R. Everett, Office of General Counsel, United States Department of Agriculture; Kathyrn Williams-Shuck and Amanda Koehler, Office of the Solicitor, United States Department of the Interior; Robert G. Dreher, Acting Assistant Attorney General, Andrew C. Mergen, J. David Gunter, Paul D. Barker, Jr., Rickey D. Turner, Daniel

J. Pollak, and Matthew Littleton (argued), Attorneys, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for Defendants-Appellees.

**OPINION**

HAWKINS, Circuit Judge:

These environmental appeals for injunctive relief bring virtually identical challenges to two logging projects in Montana's Flathead National Forest:  the *Weber* case challenges the United States Forest Service's ("Forest Service" or "Service") decision to authorize the Spotted Bear River Project, and the *Christiansen* case challenges the Soldier Addition II Project.  Plaintiffs Friends of the Wild Swan and The Swan View Coalition (collectively, "Wild Swan") appeal the district court's simultaneous denial of preliminary injunctions in both cases.  *Friends of the Wild Swan v. Weber*, 955 F. Supp. 2d 1191 (D. Mont. 2013); *Friends of the Wild Swan v. Christiansen*, 955 F. Supp. 2d 1197 (D. Mont. 2013).

Wild Swan contends the district court abused its discretion by denying its motion for injunctive relief because the Forest Service's approval of these projects violated the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA") and the Endangered Species Act ("ESA").  Wild Swan argues the court abused its discretion by failing to recognize its likelihood of success on the merits and in finding a lack of irreparable harm in the absence of an injunction.  For the reasons set forth below, we affirm.

## FACTS AND PROCEDURAL HISTORY

The Soldier Addition Project was initially proposed in 2008. The project is located in the 2.4 million acre Flathead National Forest, and would affect approximately 3,285 acres on the west side of the Flathead River's South Fork. The project would entail a prescribed burn of 1,333 acres, harvest of 1,128 acres of timber, thinning of 823 acres and clearing flammable vegetation within 1.3 acres. The Soldier Addition Project's stated goals are to restore forest and vegetation to a historical condition that would be more resilient and resistant to wildfire, disease, and insect infestation, including improving the availability of seasonal habitats and proactively treating trees at risk of, or experiencing, high mortality.

The Forest Service designated an "action area" and then investigated whether the project would adversely affect threatened species or critical habitat under the ESA, including consultation with the U.S. Fish and Wildlife Service ("USFWS"). That agency prepared a Biological Assessment with respect to bull trout and its critical habitat and concluded the proposed action was not likely to have an adverse effect. USFWS prepared a formal Biological Opinion addressing the project's impact on lynx critical habitat and grizzly bears.

The Forest Service was also required to comply with the NFMA forest plan for the area, which included directions for the management of lynx, fisher (a member of the weasel family), and westslope cutthroat trout. Following NEPA's procedural requirements, the Forest Service prepared an Environmental Assessment ("EA") to analyze potential impacts, including compliance with the forest plan, and to determine whether a full-blown Environmental Impact

Statement ("EIS") was required or whether the agency could instead issue a Finding of No Significant Impact ("FONSI").

After proposing the Soldier Addition Project, the Forest Service received comments from Wild Swan and other interested parties and issued its decision authorizing the project in May 2010. Wild Swan challenged the decision in district court on NEPA and NFMA grounds, and the Forest Service decided to withdraw its authorization in order to re-examine its environmental analysis. It then issued a new EA, considered additional comments, and ultimately issued a new FONSI and reauthorized the project in December 2011.

In the midst of the decision-making process on the Soldier Addition Project, in 2009 the Forest Service proposed another nearby project on the other side of the South Fork of the Flathead River, known as the Spotted Bear River Project. Similar to the Soldier Addition Project, the Spotted Bear Project proposed prescribed burns of 1,346 acres, harvest of up to 1,193 acres of timber, thinning of up to 660 acres and added an additional five weeks to the motorized access season. The Spotted Bear Project also would serve similar purposes as the Soldier Addition Project, such as improving habitat and increasing resistance to fire and/or disease.

The Spotted Bear Project followed a similar procedural path, gathering input from the USFWS in the form of Biological Assessments and Biological Opinions, comments on the project from Wild Swan and other interested parties, and preparation of an EA for the project. The Forest Service issued a FONSI and authorized the Spotted Bear Project in August 2011.

The initial Soldier Addition Project EA was completed before the Spotted Bear Project was proposed; however, in its revised EA (prepared after withdrawing the initial approval on the Soldier Addition), the Forest Service acknowledged the Spotted Bear Project, but concluded there would be no significant cumulative adverse effects. The Forest Service reached the same conclusion regarding the Spotted Bear Project.

After unsuccessfully appealing both Forest Service decisions to the Regional Forester, Wild Swan brought two suits in district court regarding the two projects, raising virtually identical claims that the Forest Service had violated NEPA, NFMA, and the ESA. On cross-motions for summary judgment, the magistrate judge issued lengthy reports recommending awarding judgment to the United States on all claims.

Wild Swan not only objected to the magistrate judge's recommendations, but also moved for a Temporary Restraining Order and a Preliminary Injunction to halt all project activity pending disposition of the cases on the merits. This motion for injunctive relief was prompted by a Forest Service notice that it was proceeding with project implementation by seeking bids for the "Tin Mule" timber sale, which would involve logging a portion of the units in each project (ten of sixty-two units in Spotted Bear and thirty-two of forty-nine units in Soldier Addition). In both cases, the district court denied the motion for preliminary injunction, finding Wild Swan had not demonstrated a likelihood of success on the merits, had not shown irreparable harm was likely in the absence of an injunction, and that the balance of equities tipped in favor of the Forest Service. Wild Swan appealed.

## STANDARD OF REVIEW

We review the denial of preliminary injunctive relief for abuse of discretion. *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 979 (9th Cir. 2011). An abuse of discretion occurs when the district court "based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 944 (9th Cir. 2013).

To obtain a preliminary injunction, a party must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). "[I]f a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).[1]

---

[1] Plaintiffs suggest that the district court committed legal error by not expressly applying the alternative *Cottrell* test. However, any such error was harmless, as Plaintiffs have not demonstrated either a likelihood of success *or* serious questions going to the merits of their claims. *See Farris v. Seabrook*, 677 F.3d 858, 864–65 (9th Cir. 2012) (where district court analysis conflated *Winter* and *Cottrell* factors, this court may review omitted factor de novo). As discussed in Section I.A.3. below, in the only claim in which Plaintiffs have possibly raised a serious question on the merits, they have failed to establish a likelihood of irreparable harm, as required under both the *Winter* and *Cottrell* formulations.

Wild Swan's underlying substantive claims are reviewed under the Administrative Procedure Act, which allows courts to set aside only those agency actions which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## DISCUSSION

## I.  NEPA

NEPA is a procedural statute, and requires an agency proposing a major federal action significantly impacting the environment to prepare an EIS to analyze potential impacts and alternatives.  42 U.S.C. § 4332(C).  To determine whether an EIS is required, the agency typically first prepares an EA.  40 C.F.R. § 1501.4(b).  The EA is not an exhaustive examination of every possible environmental event, but must provide sufficient evidence and analysis to determine the reasonableness of the decision not to prepare an EIS.  *See Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1129 (9th Cir. 2012); *Ctr. For Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1215 (9th Cir. 2008).  Here, with respect to both challenged projects, the Forest Service prepared an EA and determined there was no significant environmental impact requiring an EIS.  36 C.F.R. § 220.7.

## A.  Cumulative Impacts

Wild Swan's principal complaint is that the EAs failed to analyze sufficiently the cumulative impact of the two logging projects in the same segment of the South Fork at the same time, especially with respect to sediment in the river and the effects on the local grizzly bear and lynx populations.  NEPA

regulations require the Service to consider cumulative effects which "result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions" with the goal of making sure that "individually minor but collectively significant" actions are properly analyzed. 40 C.F.R. § 1508.7; *see also Kern v. BLM*, 284 F.3d 1062, 1078 (9th Cir. 2002) (purpose is to avoid "the tyranny of small decisions"). We have noted that the Forest Service must take a "hard look" at all actions, and give a "sufficiently detailed catalogue of past, present, and future projects, and provide an adequate analysis about how these projects . . . are thought to have impacted the environment." *Te-Moak Tribe v. U.S. DOI*, 608 F.3d 592, 603 (9th Cir. 2010) (internal quotation marks omitted).

A recurring theme in this appeal is whether the agency gave sufficient reasons for limiting the geographic scope of its cumulative effects analysis to one side of the river or the other. "[A]n agency has the discretion to determine the physical scope used for measuring environmental impacts." *Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002). Identifying the appropriate geographic scope "is a task assigned to the special competency of the appropriate agenc[y]," *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976), and the agency must balance need for a comprehensive analysis versus considerations of practicality, while also keeping in mind that use of a larger analysis area can dilute the apparent magnitude of environmental impacts. *See Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 958–59 (9th Cir. 2003). Nonetheless, the agency's choice may not be arbitrary, and it must provide a reasoned decision and support for its chosen level of analysis. *Rittenhouse*, 305 F.3d at 973.

1.  *Lynx*

In analyzing each proposed project's effect on lynx, the agency considered the total effects on lynx analysis units touched by the project.  A lynx analysis unit ("LAU") is a large area that approximates the home range of a female lynx and contains sufficient habitat to support lynx survival and reproduction. The Soldier Addition Project affected portions of three LAUs on one side of the river (covering approximately 122 square miles); the Spotted Bear Project affects portions of four *different* LAUs on the other side of the river (covering approximately 174 square miles).

The LAUs were not determined with reference to either project.  Rather, over a decade ago the agency divided the Flathead National Forest into LAUs using the best-available science.  The boundaries of the LAUs remain constant and are not adjusted for individual projects.  Because a single LAU may be too small to assess fully direct, indirect, and cumulative impacts, and because lynx wander outside the boundaries of a single LAU, the lynx guidance documents indicate that "project impacts must be assessed within the context of two or more LAUs."  As noted, here the Forest Service used three and four LAUs per project.

The agency did not act arbitrarily and capriciously by defining the geographic scope for studying cumulative effects in this fashion.  The groups of LAUs for each project cover several thousand acres, the boundaries were developed independent of these projects, and there is no overlap between the three LAUs touched by the Soldier Addition Project and the four LAUs affected by the Spotted Bear Project. Although Wild Swan argues the agency should have also considered effects from the neighboring project because the

lands are adjacent, the agency has to draw a line somewhere and has offered a reasonable justification for why it drew the line where it did. *See Inland Empire Public Lands Council v. USFS*, 88 F.3d 754, 764 & n.14 (9th Cir. 1996) (noting it would be difficult to determine when land stops being "adjacent").

Lynx may roam beyond the boundaries of an individual LAU, but that is why the guidance documents recommend the use of multiple units, as the Forest Service did here. In addition, as noted above, expanding the analysis area further would work to dilute the project's apparent environmental impact. *See Selkirk*, 336 F.3d at 960. The selection of these geographic areas for considering cumulative effects on lynx was neither arbitrary nor capricious, and Wild Swan has not demonstrated a likelihood of success or serious questions going to its NEPA claim with respect to lynx.

2. *Grizzly Bear*

The agency analyzed the impacts of the Soldier Addition Project within the geographic scope of three grizzly bear subunits that touch the project area (approximately 129 square miles), and the Spotted Bear Project with respect to three other subunits (approximately 115 square miles). Like a LAU, a grizzly bear subunit for the Flathead National Forest approximates a female's home range and includes a distribution of habitat by season and elevation. Also like a LAU, the bear management units and subunits were developed several years ago by an interagency committee and are not project-specific.

Wild Swan argues the Forest Service should have evaluated the cumulative effects with respect to the larger

Bear Management Unit (BMU), rather than the smaller subunits, relying on our decision in *Selkirk*, 336 F.3d at 958–60. The agency explains, however, that national forests in different ecosystems divide grizzly units differently, thus necessitating different approaches to analyzing cumulative effects depending on the particular forest/ecosystem. For example, in *Selkirk*, this court approved a NEPA analysis at the BMU level, but in that smaller ecosystem each BMU approximated the size of a female grizzly's home range. *Id.* at 960; *see also id.* at 949 (Selkirk Mountains divided into ten BMUs; Interagency Grizzly Bear Committee "considered that each unit would provide an appropriate area in which to monitor and analyze the bears").

In contrast, the Flathead National Forest is part of the 5.7 million acre Northern Continental Divide Ecosystem, and within this larger ecosystem, each *subunit* approximates a female grizzly's home range.[2] The agency further points out that if it analyzed the cumulative effects at the BMU level instead, the analysis area would be approximately 800 square miles, which would be impractically large and would dilute the project's apparent environmental impact. *See Selkirk*, 336 F.3d at 960 (expanding the analysis area could dilute the effects of proposed project).

As with the lynx, the selection of these boundaries for analyzing the cumulative effects on the grizzly bear was neither arbitrary nor capricious and Wild Swan has not

---

[2] Although Wild Swan also argues that these subunits were to be used only to measure compliance with a road access amendment to the forest plan, the Biological Opinion the Forest Service obtained from the USFWS indicated that the subunits were "the basic scale for the analysis of impacts associated with access management *and* vegetation management projects."

demonstrated serious questions or a likelihood of prevailing on this claim.

### 3. *Fisheries*

Wild Swan further argues that the Forest Service failed to analyze adequately the potential cumulative impact of the two projects on the native fishery, particularly the risk of increased sedimentation on the bull trout and westslope cutthroat trout within the main channel of the South Fork of the Flathead River, even though the projects will occur in the same segment of the South Fork (across the river from one another).

For its analysis area, the Forest Service selected a roughly seven-mile stretch along the Flathead River, beginning at its confluence with the Spotted Bear River and continuing downstream to the Hungry Horse Reservoir. The upstream point was chosen because the greatest risk of sediment discharge from either project would be from the possibility of runoff from a severe rainstorm shortly after a prescribed burn, and the substantial majority of burn units and other project improvements, such as culvert upsizing, are located downstream of that confluence point.

The endpoint of the Service's cumulative analysis was the entrance to the Hungry Horse Reservoir. The Service did not consider areas downstream of the reservoir because the reservoir is so large that it would have a "very significant buffering effect" so that there would be "virtually no measurable effect of any proposed management activity to water quality or water quantity" in or downstream from the reservoir. The Service has offered reasonable justifications

for selecting the beginning and endpoint along the river that are not arbitrary or capricious. *Rittenhouse*, 305 F.3d at 973.

The EAs also addressed each project's potential sediment impact on this main channel of the South Fork,[3] but concluded there would be little significant impact  because: (1) 99% of the potential sediment would occur only in the "worst-case scenario," i.e., if there were a high-intensity rainstorm shortly after a prescribed burn, which the EAs concluded was not likely based upon recent local fire history[4]; and (2) even if the worst-case scenario occurred, it would be diluted by the considerably larger flow of the South Fork and "not . . . outside the range of natural variability" in that system.

Relying in large part on the hydrology discussion, the EAs also analyzed each project's impacts on fisheries, including fish and fish habitat within the agency's defined cumulative effects area.  The EAs concluded that although there could be "short-term negative effect[s] on the westslope cuttroat trout," in light of the robust population in the area, the action would not likely contribute towards a loss of viability to the population or species.  Similarly, noting that bull trout do not spawn within the project area, there would be "no adverse modification of critical habitat" for that species, and determined that the projects would actually improve the habitat quality in the long term.

---

[3] The EA for each project recognized the potential to discharge additional sediment to the South Fork of the Flathead River.

[4] This is because most high-intensity storms occur during the summer, and the prescribed burns in the project are scheduled for spring or fall.

Wild Swan correctly points out that the EAs did not specifically consider the impact to the main channel of South Fork if the "worst-case" scenario for both projects occurred and delivered sediment to the main channel simultaneously. However, even assuming Wild Swan has shown a possibility of success on this issue or at least serious questions on the merits, we nonetheless affirm the denial of the preliminary injunction because Wild Swan has not established a likelihood of irreparable harm to the fisheries in the absence of an injunction. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) ("[P]laintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction."). Both EAs indicate it is highly unlikely that the "worst-case scenario" event (intense storm following prescribed burn) for either project would ever occur because of the seasonal timing of the burns, and thus it appears doubly unlikely that all potential sediment discharge from both projects would occur simultaneously.

Wild Swan has not shown any likelihood that the prescribed burns for each project would occur at exactly the same time. In fact, the project decisions state that because conditions must be ideal, the prescribed burns could take up to ten years to complete. In addition, according to the Forest Service declaration submitted in response to the motion for injunctive relief, at that time only limited thinning/prep work for some burns was proposed, with the possibility of prescribed burns in two of the fifteen Spotted Bear treatment units and four of the seven Soldier Addition treatment units later that fall, and then only if weather conditions cooperated. The district court did not abuse its discretion by determining Wild Swan has not demonstrated an imminent injury in the absence of injunctive relief. *See Caribbean Marine Servs. v.*

*Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("[P]laintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief.").

## B.  Need for an EIS

Wild Swan's second argument regarding NEPA is essentially a logical extension of the first:  that the Forest Service should have considered the cumulative impacts from the neighboring project in determining whether or not to prepare a full-blown EIS.  The agency must prepare an EIS if substantial questions are raised as to whether a project may cause significant environmental impacts.  *Ocean Advocates v. USACE*, 402 F.3d 846, 864 (9th Cir. 2005).  One factor for the agency to consider is "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts."  40 C.F.R. § 1508.27(b)(7).

As discussed above, with respect to the lynx and grizzly bear, the Forest Service prepared a separate EA for each project and its FONSI addressed the cumulative effects within geographic areas that are larger than those affected by the particular project, but limited to one side of the river. Because Wild Swan has not demonstrated that the Forest Service acted arbitrarily in delineating the geographic boundaries of its cumulative effects analysis, we affirm the denial of the preliminary injunction because Wild Swan has not demonstrated a likelihood of success on the merits of its NEPA claim.  *Cf. Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006).  As also discussed above, the Forest Service sufficiently addressed the effects of each project on the fisheries, but even if the Forest Service should have also considered the cumulative impact of both worst-case sediment scenarios on the main channel of the South

Fork, there is no immediate risk of irreparable injury justifying a preliminary injunction.

## II.  NFMA

Under the NFMA, the Forest Service is obligated to ensure all project decisions are consistent with the general forest plan, 16 U.S.C. §1604(i), which in this case is the Flathead National Forest Plan.   The "Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference," *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012), but we must be able to "reasonably discern from the record that the Forest Service complied" with the plan's standards.   *Native Ecosystems Council v. USFS*, 418 F.3d 953, 961–62 (9th Cir. 2005).

### A.  VEG S6 for Lynx

Wild Swan contends that the project violates Standard VEG S6 in the 2007 Northern Rockies Lynx Management Direction.  This standard prohibits logging and burning that reduces "snowshoe hare [a favorite prey of the lynx] habitat in multi-story mature or late successional forests" except in "areas that have potential to improve winter snowshoe hare habitat but presently have poorly developed understories that lack dense horizontal cover." The Lynx Direction defines "winter snowshoe hare habitat" as "places where young trees or shrubs grow densely–thousands of woody stems per acre–and tall enough to protrude above the snow during winter, so snowshoe hare can browse on the bark and small

twigs."[5]  It also defines "multi-story mature" as a forest stage of development similar to "old multi-story structural stage" but with trees that are generally not as old and less abundant decaying trees.

The parties agree that portions of both projects involve "multi-story mature" forests, but disagree as to whether there is snowshoe hare habitat within such areas.  *See Friends of the Wild Swan v. USFS*, 875 F. Supp. 2d 1199, 1204–05 (D. Mont. 2012) (to trigger VEG S6 project must occur in multi-story mature forest *and* reduce snowshoe hare habitat).  The Forest Service analyzed lynx habitat maps, computer GIS analysis, and aerial photographs, and then performed on-the-ground field inspections to verify whether habitat existed within the proposed treatment units.  Areas found to have quality snowshoe hare habitat were dropped from the project.

Wild Swan contends, however, that in conducting this analysis, the Forest Service used a new methodology that contravenes the definitions of VEG S6.  Wild Swan argues that the Lynx Direction considers only two variables:  stand structure (mature or young) and stem density (number of trees per acre).  The Forest Service, however, also analyzed the amount of "horizontal cover" provided, which is defined in the Lynx Direction as "visual obscurity or cover provided by habitat structures that extend to the ground or snow surface primarily provided by tree stems and tree boughs, but also includes herbaceous vegetation, snow, and landscape topography."  Pursuant to a draft guidance for assessing horizontal cover, if the percentage of horizontal cover was more than 35% in winter or 48% in summer then the area was

---

[5] Low density includes approximately 1000–2500 trees per acre and high density includes approximately 2500 trees per acre.

considered snowshoe hare habitat and VEG S6 applied. While Wild Swan argues this is a significant change that required public notice and an amendment to the Forest Plan, the Forest Service contends the new guidance was merely a means of assessing compliance with the existing standard.

The analysis in the Lynx Direction under "[e]valuating the amount of winter snowshoe hare habitat" primarily focuses on stand and stem density, but it does not appear that these are the only factors to be considered. For example, even in multi-storied forests with high tree density, the Lynx Direction indicates it "*may* provide good foraging habitat *where small trees occur in dense, irregular clumps underneath the overstory*." Likewise, in multi-story forests with lower density, the Direction indicates there may be quality habitat "*depending on* how the trees are distributed." Further, as noted above, areas with poorly developed understories that lack dense horizontal cover are excepted from VEG S6.

In light of the deference we must apply to the Forest Service's scientific judgments regarding methodology and its interpretation of its own forest plans, *see Weldon*, 697 F.3d at 1053, the Forest Service's use of a methodology for assessing the amount of quality horizontal cover within these areas of potential hare habitat is not likely a change from VEG S6 but more likely a means of assessing compliance with the existing standard. The district court did not abuse its discretion by determining Wild Swan has not demonstrated a likelihood of success on the merits of its NFMA claim regarding VEG S6, nor has Plaintiff raised serious questions on the merits of this claim.

**B. Viability Standard for Fisher**

The fisher is a medium-sized, forest-dependent member of the weasel family.  It is a sensitive species and a management indicator species ("MIS") in the Flathead National Forest.  The fisher is "an indicator that the needs of other forest carnivores are met, as well as wildlife that use closed-canopy . . . forests, particularly [moist] forests associated with riparian zones."  As a sensitive species, the Forest Service is required to monitor the "change in population status" and distribution of the fisher and ensure "project decisions will not result in loss of species viability or create significant trends towards federal listing" of the species.

The Forest Service indicated in the EA that "fishers are more difficult to detect than most species . . . and monitoring results are often inconclusive." Wild Swan argues that instead the monitoring methods are failing to confirm the presence of fisher in the area.  The Forest Service explains, however, that the fisher is a "low-density carnivore," which does not live or travel in packs but is a solitary and territorial creature that requires large home ranges of about fifteen square miles.  For example, in high-quality habitats in British Columbia, fisher density is estimated at between 0.01 and 0.0154 per km.  A 2010 study of historical records indicated that the fisher is one of the lowest-density carnivores in Montana, making "the likelihood of seeing fisher in a specific project area . . . very low."

Nonetheless, the Forest Service used all available population data, including information from the Montana Department of Fish, Wildlife & Parks that its personnel had encountered fisher tracks for the past several years in the

course of winter track surveys, and available trapping data regarding fisher harvests in the region, which yielded consistent results over the past decade.[6]  Indeed, there were 481 fisher sightings in Montana, "with numerous sightings in Northwest Montana within the last ten years."  Based on the available data, the agency found no reason to believe that the fisher population in the project area was in decline.

The Forest Service acknowledged that the proposed projects would affect small portions of fisher habitat from the removal of mature forest stands (818 acres in Spotted Bear; 1092 acres in Soldier Addition).  It concluded, however, that the impacts would be negligible and would not harm population viability because a significant amount of sufficient habitat for fisher would remain in the area.  This is commonly referred to as using habitat as a proxy for viability; in turn, if the species is used as an indicator of the population of another species, it is a "proxy-on-proxy" approach.

The use of this proxy approach is appropriate "where both the Forest Service's knowledge of what quality and quantity of habitat is necessary to support the species and the Forest Service's method for measuring the existing amount of that habitat are reasonably reliable and accurate."  *Native Ecosystems Council v. USFS*, 428 F.3d 1233, 1250 (9th Cir. 2005).  We have generally accepted the use of habitat as a proxy for population "absent some indication in the record that USFS's underlying methodology is flawed," *Envt'l Prot.*

---

[6] The fisher data appear to be statewide in Montana, versus the specific area affected by the project.  However, with respect to trapping, the EA explains that the trapping season in the state is December to February, a time at which all roads to the actual project area have been closed for the season.

*Info. Ctr. ("EPIC") v. USFS*, 451 F.3d 1005, 1017 (9th Cir. 2006), that is, so long as the habitat proxy "reasonably ensures that the proxy results mirror reality." *Gifford Pinchot Task Force v. USF&WS*, 378 F.3d 1059, 1066 (9th Cir. 2004). For example, in *Native Ecosystems Council v. Tidwell*, 599 F.3d 926 (9th Cir. 2010), we invalidated the use of the proxy-on-proxy approach where there was no data indicating the presence of the species in the area, no suggestion there was difficulty monitoring the species, and a flaw in the Forest Service's methodology that further undermined the use of the habitat proxy approach. *Id.* at 933–35.

However, "[m]onitoring difficulties do not render a habitat-based analysis unreasonable, so long as the analysis uses all the scientific data currently available." *The Lands Council v. McNair*, 537 F.3d 981, 998 (9th Cir. 2008) (en banc), *overruled in part on other grounds by Winter*, 555 U.S. at 20; *see also Inland Empire*, 88 F.3d at 763 n.12 (noting that there was no reliable and cost-effective method of counting individual members of a small, reclusive species such as the pileated woodpecker).[7]

Here, in analyzing the habitat, the Forest Service used the best available scientific data to define potential fisher habitat, taking into consideration factors such as the maturity of the forest, proximity to riparian features, and connectivity of habitat areas. With respect to the Spotted Bear Project, the Service determined that approximately 44% of the total

---

[7] Similar to *Inland Empire*, here the Forest Service indicates that to obtain reliable data, a trapping/telemetry study would be necessary but that there is no ongoing fisher research in the Flathead National Forest on which to rely.

project area was potential fisher habitat, and that only 3% of that habitat would be affected by the proposed project. With respect to Soldier Addition, approximately 57% of the project area is potential fisher habitat, with only 3–4% being affected by the proposed project. The Service also consulted the primary researcher on fisher populations in Idaho and Montana, who indicated he "could not quantify the effect of such a fine-scale habitat change."

Wild Swan does not level specific criticisms at the Forest Service's habitat methodology, other than to complain that no fisher were actually detected in the relatively small project area. As explained above, given the creature's solitary nature and wide dispersal patterns, this is unsurprising and likely due to monitoring difficulties, but not necessarily indicative of a decline in population. *See Lands Council v. McNair*, 629 F.3d 1070, 1082 (9th Cir. 2010). The district court did not abuse its discretion in determining that Wild Swan has not shown a likelihood of success on its NFMA claim, nor has Plaintiff raised serious questions on the merits of this claim. *See EPIC*, 451 F.3d at 1017.

## III.    ESA

Section 7 of the ESA requires the Forest Service to consult with the USFWS to ensure the proposed project is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of critical habitat for such species." 16 U.S.C. § 1536(a)(2). In this case, potentially affected species include bull trout, lynx and grizzly bear. When evaluating the effects of the action, the agency is to consider direct and indirect effects to the species and/or critical habitat, together with other activities added to the

environmental baseline, which includes "the past and present impacts of all Federal . . . activities in the action area, [and] the anticipated impacts of all proposed Federal projects in the action area . . . ."  50 C.F.R. § 402.02.  The choice of appropriate action areas "requires application of scientific methodology and, as such, is within the agency's discretion." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002).

Similar to its NEPA argument above, Wild Swan contends the Forest Service utilized an unduly narrow "action area" and that it should have, instead, considered the Soldier Addition and Spotted Bear Projects together.  With respect to the lynx and the grizzly bear, the agency's justification for its choice of analysis area is the same as in the NEPA analysis set forth above, and we likewise conclude that Wild Swan has not demonstrated a likelihood of success or serious questions on the merits of its ESA claims with respect to these animals.

With respect to the bull trout, Wild Swan argues that the action area was too narrowly defined to exclude the main channel of the South Fork. As also discussed above, the Forest Service did include what it considered to be the relevant portions of that channel in the bull trout action area, and gave reasons for selecting the upper and lower limits of the river that are not arbitrary or capricious.  There is no bull trout spawning habitat within this particular stretch of the river.  Although some critical habitat does exist within this action area, the Forest Service and USFWS agreed each project was not likely to affect the habitat or species adversely.  This informal consultation satisfied the requirements of the ESA and no formal consultation was thus required.  *See* 50 C.F. R. § 402.13;  *see also Conservation Congress v. USFS*, 720 F.3d 1048, 1056–57 & n.7 (9th Cir.

2013).   The district court did not abuse its discretion by determining Wild Swan has not demonstrated a likelihood of success or serious questions on the merits of its ESA claims.

## CONCLUSION

For the foregoing reasons, we conclude the district court did not abuse its discretion by denying Wild Swan's motion for a preliminary injunction.

**AFFIRMED.**