FILED

DEC 21 2016

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS



**NOT FOR PUBLICATION**

## UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

QUECHAN TRIBE OF THE FORT
YUMA INDIAN RESERVATION,

Plaintiff-Appellant,

v.

U.S. DEPARTMENT OF THE
INTERIOR; et al.,

Defendants-Appellees,

OCOTILLO EXPRESS LLC,

Intervenor-Defendant-
Appellee.

No.    13-55704

D.C. No.
3:12-cv-01167-GPC-PCL

MEMORANDUM*

Appeal from the United States District Court
for the Southern District of California
Gonzalo P. Curiel, District Judge, Presiding

Argued and Submitted November 3, 2015
Pasadena, California

Before:  FARRIS, BYBEE, and N.R. SMITH, Circuit Judges.

---

\*      This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

Quechan Tribe of the Fort Yuma Indian Reservation ("Quechan Tribe") appeals the district court's order granting summary judgment in favor of the Appellees, including the Bureau of Land Management ("BLM"). Quechan Tribe maintains that the BLM violated (1) the California Desert Conservation Area ("CDCA") Plan, (2) the Federal Land Policy and Management Act ("FLPMA"), and (3) the National Environmental Policy Act ("NEPA") when it granted Ocotillo Express LLC ("Ocotillo") a right-of-way to construct and operate the Ocotillo Wind Energy Facility ("OWEF Project" or "the Project") near Ocotillo, California. We may affirm a district court's grant of summary judgment "on any basis supported by the record." *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1047 (9th Cir. 2009). Because the parties are familiar with the facts and procedural history of this case, we will not recount them here.

1. Quechan Tribe first contends the BLM violated the CDCA Plan by failing to determine whether the OWEF Project met the substantive requirements the Plan imposes on proposed uses of Class L land—the class of land upon which the OWEF Project is located. The CDCA Plan governs all land use activities within the CDCA. Because the OWEF Project is located on CDCA land, the BLM was required to ensure the Project complied with the Plan before granting the right-of-way. Significantly, the CDCA Plan includes a Plan amendment process that allows

2

the BLM to make changes to the Plan for a multitude of reasons, including accommodating a specific project that might not otherwise comply with the CDCA Plan. *See* BLM, California Desert Conservation Area Plan 1980, as amended, at 119 (Mar. 1999) [hereinafter CDCAP].

In the Record of Decision granting a right-of-way for the OWEF Project, the BLM adopted a Category 3 Plan amendment to accommodate the Project. *See* BLM, Record of Decision Ocotillo Wind Energy Facility and Amendment to the California Desert Conservation Area Plan, at 39 (May 2012). The BLM amended the CDCA Plan to designate the approximately 10,151 acres of public land where the Project was to be located as suitable for wind energy development. *Id.* at 1.

A Category 3 amendment "accommodate[s] a request for a specific use or activity [that] will require additional analysis" of its own. CDCAP, at 119. A Category 3 amendment, like a zoning variance, allows the BLM to carve out an exception to the CDCA Plan for a specific use or activity. *Id.* Once the BLM determines that a specific project warrants a Category 3 amendment, that project is no longer required to comply with the substantive requirements of the class of land on which the project is sited. Rather, the project is governed by the Plan amendment.

3

When considering a Category 3 amendment, the District Manager begins by evaluating the "additional analysis" specific to the use or activity for which the amendment is requested. *Id.* at 121. This additional analysis is generally an Environmental Impact Statement ("EIS"); therefore, a Category 3 amendment does not require its own EIS. *Id.* at 119, 121. If the District Manager approves, he or she recommends the amendment to the State Director. *Id.* at 121. If the State Director agrees, the District Manager renders a decision and issues a public notice of the amendment decision that clearly explains how the CDCA Plan would be changed by the amendment. *Id.* The BLM must then allow thirty days for the public to object to the amendment. *Id.* After resolving the objections, the BLM may approve the amendment. *Id.* The District Manager also has a series of six determinations and obligations that must be completed before the amendment can be approved. *Id.* The BLM substantially complied with this process.

Once the BLM adopted this Category 3 amendment to accommodate the OWEF Project, the Project was no longer required to comply with the multiple-use class designations, guidelines, or elements for Class L land. Therefore, even if we agree with Quechan Tribe that the BLM failed to determine whether the OWEF Project met the substantive requirements the Plan imposes on proposed uses of Class L land, we must nevertheless conclude that the Project did not violate the

4

CDCA Plan. The Project was governed by the Plan amendment rather than the Plan itself. Accordingly, we affirm the district court's grant of summary judgment finding that the BLM did not violate the CDCA Plan.

2. Quechan Tribe next contends that the BLM violated FLPMA by arbitrarily assigning the interim Visual Resource Management classification of the Project site. FLPMA directs the BLM to inventory public lands and their resources, including the "scenic values" of public lands. 43 U.S.C. § 1711(a). To inventory the scenic values of public lands, the BLM prepares a Visual Resource Inventory ("VRI") that assigns a VRI Class (I through IV) to each area of land analyzed. *See* BLM, Manual Handbook: Visual Resource Inventory (H-8410-1) (Jan. 17, 1986) [hereinafter VRI Handbook]. The VRI Class designations are merely informational; they do not constrain or limit land use activities. *Id.* at 6. Using the assigned VRI Classes as a basis, the BLM assigns Visual Resource Management ("VRM") Classes (I through IV) to an area, typically during the development of a land use plan. *See* BLM, Manual Handbook: Visual Resource Management (H-8400) (Apr. 5, 1984). VRM Classes "prescribe[] the amount of change allowed in the characteristic landscape." *Id.*, Glossary, at 6. VRM Class I allows the least amount of change to the existing character of the landscape and VRM Class IV permits the greatest amount of change. VRI Handbook, at 6–7.

When a new land use is proposed on public lands where the governing land use plan lacks VRM Class designations, the BLM must establish interim VRM Classes. VRI Handbook, at 7.

The CDCA Plan does not provide VRI or VRM Class designations for the land where Ocotillo proposed building the OWEF Project; therefore, the BLM was required to establish interim VRM Classes for the Project site. In its final EIS for the OWEF Project, the BLM assigned the Project site an interim VRM Class of IV—the least restrictive class. Quechan Tribe argues that this assignment was arbitrary and incompatible with the requirements of Class L land status. Again, even if we agreed with Quechan Tribe, we conclude that the BLM's approval of the OWEF Project (and its interim VRM Class IV designation) was permissible because the BLM adopted a Category 3 amendment to the CDCA Plan. We need not decide whether the VRM Class IV designation conflicts with Class L land status, because the Project was governed by the Plan amendment and was not subject to the substantive requirements of Class L land. Accordingly, we affirm the district court's conclusion that the BLM did not violate FLPMA.

3. Finally, Quechan Tribe claims that the BLM violated NEPA by failing to consider the cumulative impacts of alternative energy projects on all Class L lands in the CDCA. Each EIS must contain a cumulative effects analysis, which

"analyze[s] the impact of [the] proposed project in light of that project's interaction with the effects of past, current, and reasonably foreseeable future projects." *Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir. 2004); 40 C.F.R. § 1508.7. Agencies have discretion in determining the geographic scope of the cumulative effects analysis, but must provide reasoned support for the geographic scope of its analysis. *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 943 (9th Cir. 2014).

The BLM analyzed the entire 12,436 acres of the proposed Project site, plus a ten-mile radius in assessing the cumulative effects on visual and cultural resources. The BLM reasoned that the visibility of the OWEF Project would substantially diminish beyond ten miles and this area would encompass any combined effects of the OWEF Project and other projects on cultural resources. This justification sufficiently supported the BLM's chosen geographic scope of the cumulative impacts analysis. The BLM need not have analyzed the cumulative impact of alternative energy projects throughout all Class L lands in the CDCA as this would have been unduly burdensome and it would have diluted the anticipated impact of the OWEF Project on resources in the project area. *See Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 960 (9th Cir. 2003).

The BLM identified 116 past, present, and reasonably foreseeable projects that could have an impact on cultural resources in this area. The BLM then

described the existing damage to cultural resources in that area and discussed generally how reasonably foreseeable projects would further impact those resources. Such analysis was sufficient to identify and describe the cumulative impacts on cultural resources. The BLM similarly analyzed each potentially impacted resource. Because the BLM's cumulative impacts analysis was not arbitrary or unreasonable, we conclude the BLM's analysis did not violate NEPA.

**AFFIRMED.**

FILED

DEC 21 2016

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*Quechan Tribe of Fort Yuma v. DOI*, No. 13-55704 (Pasadena - November 2, 2015)

BYBEE, Circuit Judge, concurring in the judgment:

I respectfully disagree with the majority's decision to approve the Ocotillo Wind Energy Facility ("OWEF") because the BLM amended its California Desert Conservation Area Plan ("CDCA Plan"). In my view the BLM approved the OWEF project because it conformed to the CDCA Plan, not as a way of short circuiting our review.

Since 1980, the CDCA Plan has provided that wind energy generation facilities for this land classification "[m]ay be allowed after NEPA requirements are met." Here, the BLM did exactly what it was supposed to do. It prepared an exhaustive environmental impact statement. It carefully considered the impact that the proposed project would have on cultural and natural resources in the area and, in response, it reduced the footprint of the project. The BLM also acknowledged that it could not satisfy all of the competing claims to the land and, in an exercise of its judgment, it decided to approve the OWEF. Only after it had satisfied itself that it had heard from all interested parties, considered their views, followed the processes set forth in the CDCA Plan, and determined that the project conformed with the Plan's requirements, did the BLM amend the CDCA Plan. In

my view, the BLM did not amend the CDCA Plan to avoid the Plan's requirements and this court's scrutiny under the APA; it amended the CDCA Plan to reflect that the OWEF project was consistent with the Plan and to add OWEF to a list of approved energy development sites in the CDCA. The BLM's careful and considered decision was model and is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

I concur in the judgment.