**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CONSERVATION CONGRESS,
        *Plaintiff-Appellant*,

    v.

UNITED STATES FOREST SERVICE;
UNITED STATES FISH AND WILDLIFE
SERVICE,
        *Defendants-Appellees*,

SIERRA PACIFIC INDUSTRIES,
    *Intervenor-Defendant-Appellee*.

No. 12-16452

D.C. No.
2:11-cv-02605-
LKK-EFB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, Senior District Judge, Presiding

Argued and Submitted
January 8, 2013—Pasadena, California

Filed June 13, 2013

Before: Alex Kozinski, Chief Judge, M. Margaret
McKeown, and Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[*]

### Environmental Law

The panel affirmed the district court's order denying a motion for a preliminary injunction which sought to enjoin a federal agency's authorization of a timber sale known as the Mudflow Vegetation Management Project in the Shasta-Trinity National Forest in California.

Plaintiff alleged that federal agencies failed to adequately evaluate the effects of the Mudflow Project on the Northern Spotted Owl's critical habitat in violation of the Endangered Species Act. The panel held that the appeal was not rendered moot by a new 2013 habitat designation, and subsequent reinstatement of informal consultation between the United States Forest Service and the Fish and Wildlife Service. The panel also held that the district court did not abuse its discretion when it determined that plaintiff failed to show a likelihood of success on the merits as to its Endangered Species Act claim that federal defendants arbitrarily or capriciously approved the Mudflow Project.

### COUNSEL

James J. Tutchton (argued), Tutchton Law Office LLC, Centennial, Colorado, for Plaintiff-Appellant.

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Vivian H.W. Wang (argued); Ignacia S. Moreno, Assistant Attorney General; Robert P. Williams; Mary Hollingsworth; E. Ann Peterson, United States Department of Justice, Environmental & Natural Resources Division, Washington, D.C.; Sarah Birkeland, Office of the General Counsel, United States Department of Agriculture, Washington, D.C.; Veronica Rowan, Office of the Solicitor, United States Department of the Interior, Washington, D.C., for Defendants-Appellees.

Julie A. Weis (argued), Haglund Kelley Jones & Wilder LLP, Portland, Oregon, for Defendant-Intervenor-Appellee.

## OPINION

M. SMITH, Circuit Judge:

This case arises from a federal agency's authorization of a timber sale, known as the Mudflow Vegetation Management Project (Mudflow Project or Project), and its potential effects on the Northern Spotted Owl's (Owl) critical habitat. Plaintiff-Appellant Conservation Congress (CC) sued federal Defendants-Appellees,[1] alleging that they had failed to adequately evaluate the effects of the Mudflow Project on the Owl's critical habitat, in violation of section 7(a)(2) of the Endangered Species Act (ESA), 16 U.S.C.

---

[1] Defendants-Appellees are United States Forest Service (Forest Service) and United States Fish & Wildlife Service (FWS) (collectively, Defendants).

§ 1536(a)(2), among other claims.[2] CC unsuccessfully sought to enjoin the Mudflow Project based on its ESA claim. CC now appeals the district court's denial of its motion for a preliminary injunction. We conclude that the district court did not abuse its discretion when it determined CC failed to show a likelihood of success on the merits as to its ESA claim that Defendants arbitrarily or capriciously approved the Mudflow Project. Accordingly, we affirm.

## FACTS AND PRIOR PROCEEDING

CC asserts two claims under ESA section 7(a)(2) against Defendants. CC alleges that: (1) the Forest Service's biological assessment (BA) for the Mudflow Project failed to adequately evaluate the Project's potential effects on the Owl's critical habitat, in violation of 16 U.S.C. § 1536 and 50 C.F.R. § 402.12(a); and (2) the FWS issued an arbitrary concurrence letter accepting the BA's conclusion, in violation of 16 U.S.C. § 1536(a)(2) and 50 C.F.R. § 402.14(a).

### A.  Statutory Framework

The Endangered Species Act of 1973, 16 U.S.C. §§ 1531, *et seq.*, "is a comprehensive scheme with the broad purpose of protecting endangered and threatened species." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1106 (9th Cir. 2012) (citation and quotes omitted); *see also* 16 U.S.C. § 1531. To further this aim, ESA section 7(a)(2) imposes both substantive and procedural duties on certain federal agencies. *Forest Guardians v. Johanns*, 450 F.3d 455, 457 (9th Cir. 2006).

---

[2] CC also brought a claim under the National Environmental Policy Act (NEPA), which is not at issue in this appeal.

Substantively, section 7(a)(2) requires federal agencies, such as the Forest Service, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). Procedurally, before initiating any action in an area that contains threatened or endangered species, federal agencies must consult with the FWS (for land-based species) or the National Marine Fisheries Service (for marine species) to determine the likely effects of any proposed action on species and their critical habitat. *Natural Res. Defense Council v. Houston*, 146 F.3d 1118, 1126 (9th Cir. 1998); *Forest Guardians*, 450 F.3d at 457 n.1. The ESA and its implementing regulations establish a framework for such inter-agency consultation. The agency proposing the action (action agency)—in this case, the Forest Service—must independently determine whether the action "may affect" a listed species or its habitat under the ESA. 50 C.F.R. § 402.14(a). If the answer is yes, "formal consultation" with the appropriate consulting agency is generally mandatory. 50 C.F.R. §§ 402.14(a)–(c). An action agency may bypass formal consultation if it determines, and the consulting agency agrees, that the proposed action "is not likely to adversely affect any listed species or critical habitat." 50 C.F.R. § 402.14(b)(1). When that occurs, "the consultation process is terminated, and no further action is necessary." 50 C.F.R. § 402.13(a). If, however, after this "informal consultation," the consulting agency disagrees that the proposed action is not likely to have adverse effects, then formal consultation is required. *Medina Cnty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 693 n.8 (9th Cir. 2010); 50 C.F.R. § 402.14. In formal consultation, the consulting agency must prepare a biological opinion that

advises the action agency as to whether the proposed action, alone or "taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4).

## B. The Northern Spotted Owl

The Northern Spotted Owl lives in old-growth and mature forests that extend from southwestern British Columbia through parts of Washington, Oregon, and California. The FWS listed the Owl as a threatened species under the ESA and designated 6.9 million acres of "critical habitat" for the Owl in the early 1990s. 55 Fed. Reg. 26114 (June 26, 1990); 57 Fed. Reg. 1796 (Jan. 15, 1992). The ESA defines "critical habitat" for a threatened or endangered species to mean areas that are "essential to" or "essential for" the species' conservation. 16 U.S.C. §§ 1532(5)(A)(i), (ii).[3] The FWS has divided the Owl's critical habit into four components: (1) nesting, (2) roosting, (3) foraging, and (4) dispersal. *See* 57 Fed. Reg. at 1797.

## C. The Mudflow Project

The Mudflow Project is located on the Shasta-Trinity National Forest, northeast of McCloud, California. The Project area comprises approximately 13,830 acres of land,

---

[3] The 2008 habitat rule for the Owl designated 29 units as critical habitat for the Owl in Washington, Oregon, and California, totaling approximately 5.3 million acres. 73 Fed. Reg. 47326, 47352 (Aug. 13, 2008). The 2013 habitat rule increased the designation of the Owl's critical habit to approximately 9.6 million acres, to be consistent with current conservation needs of the Owl, as described in the 2011 Revised Recovery Plan for the Owl. 77 Fed. Reg. 71876, 71894 (Dec. 4, 2012).

and was developed to address several issues:  declining forest health due to tree root disease and overstocking, threat of wildfire to nearby communities, and declining wet meadow ecosystems.  The Project's proposed treatments include thinning, sanitation and regeneration, and restoring wet meadow ecosystems, among others.  A total of 544 acres of the Owl's critical habitat are proposed for Project treatment.

### D.  Biological Assessment

On February 15, 2008, the Forest Service prepared a biological assessment analyzing the potential effects of the Mudflow Project on the Owl and its critical habitat.  The BA determined that the Mudflow Project area contains 510 acres of suitable nesting/roosting habitat and 5,125 acres of suitable foraging habitat, but that no Owls occupied the Project area.[4]

To evaluate whether a forest management project, such as the Mudflow Project, is likely to adversely affect critical habitat, the Forest Service applies a three-tier classification system for "estimated degree of change":  degraded, downgraded, and removed.  "Degraded" means the treatment will reduce habitat elements, "but not to the degree where existing habitat function is changed." "Downgraded" habitat will not function in the capacity that existed before treatment, but retains some habitat function.  "Removed" means habitat elements will be reduced to the degree that it no longer functions as habitat for the species.

---

[4] The BA was prepared before the 2008 habitat rule and thus applied the 1992 standard.  FWS issued an updated concurrence in 2012 to account for revisions to the critical habitat designation for the Owl.

According to the BA, the short-term effects of the proposed treatments would "temporarily 'degrade' but . . . not 'remove'" foraging habitat in designated critical habitat within the Project area.  But in the long-term, Project treatments would improve forest health and resistance to insects and disease, increase tree diameter by reducing inter-tree competition, and encourage understory reproduction.  In sum, the BA determined that the Project would "temporarily degrade[]" a total of 1,719 acres of the Owl's suitable foraging habitat within the Project area.  No nesting/roosting areas would be degraded, and no part of the Owl's critical habitat would be "downgraded" or "removed."  The BA concluded that the Mudflow Project "may affect, but is not likely to adversely affect,"[5] the Owl or its critical habitat.

## E.  Informal Consultation and Concurrence

In April 2008, the Forest Service engaged in informal consultation with the FWS.  The FWS concurred with the Forest Service's determination that the Mudflow Project "is not likely to adversely affect" the Owl or its critical habitat.

---

[5] The conclusion "is not likely to adversely affect" is appropriate "when effects on listed species are expected to be discountable, or insignificant, or completely beneficial."  U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act* 3-12 (1998) (hereinafter, ESA Handbook). "Beneficial effects" means contemporaneous positive effects without any adverse effects to the species"; "insignificant effects" pertain "to the size of the impact and should never reach the scale where take occurs"; and "discountable effects" are effects that are "extremely unlikely to occur." *Id.* at 3-12 (bolding removed).

In late 2011 and early 2012, the Forest Service engaged in further consultation with the FWS regarding the Mudflow Project, in light of new literature and additional updated information. In February 2012, the FWS reconcurred with the Forest Service that the Mudflow Project "may affect, but is not likely to adversely affect designated critical habitat," given that (1) treatments were not proposed within nesting or high-quality foraging habitat, and (2) 171 acres of treated foraging habitat would retain its function. On June 7, 2011, the Forest Service approved the Mudflow Project in its record of decision, thereby ending the consultation process. 50 C.F.R. § 402.13(a).

In December 2012, while this appeal was pending, the Forest Service reinitiated additional informal consultation with the FWS regarding the potential effects of the Mudflow Project on the Owl, in light of the 2013 revised habitat rule. On April 22, 2013, the FWS issued a third concurrence letter agreeing with the Forest Service's determination that the "Project may affect, but is not likely to adversely affect designated critical habitat" for the Owl.

## F.  Procedural History

CC filed its original complaint on October 3, 2011, seeking declaratory and injunctive relief against Defendants. CC amended the complaint in March 2012, which Defendants answered. On April 9, 2012, CC moved for a preliminary injunction as to its ESA claim. The district court denied the motion on June 19, 2012. CC timely appealed the district court's denial of its motion for preliminary injunction. A week before oral argument, Defendants filed a Suggestion of Mootness, seeking dismissal of the appeal because of recent events.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1292(a)(1). We review a district court's denial of a preliminary injunction for abuse of discretion. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 468 (9th Cir. 2010). The abuse of discretion standard is "limited and deferential," and we may only reverse the district court's decision if it was based on an erroneous legal standard or clearly erroneous findings of fact. *Id.* (quotes omitted).

## DISCUSSION

### I.  Mootness

In its Suggestion of Mootness, Defendants argue that a new 2013 habitat designation, and subsequent reinstatement of informal consultation between the Forest Service and the FSW, render this appeal moot. We disagree. "A claim is moot if it has lost its character as a present, live controversy." *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997). Stated another way, a claim is moot and must be dismissed if "an event occurs that prevents the court from granting effective relief." *Id.* Defendants, as the party seeking dismissal based on mootness, "bear[] a heavy burden," as they "must show that it is absolutely clear that the allegedly wrongful behavior will not recur if the lawsuit is dismissed." *Rosemere Neighborhood Ass'n v. EPA*, 581 F.3d 1169, 1173 (9th Cir. 2009) (citation and quotes omitted); *see also Forest Guardians*, 450 F.3d at 461.

Defendants fail to meet this burden. As the April 2013 FWS concurrence letter filed by Defendants reveals, Defendants continue precisely the behavior CC challenges—

approving the Mudflow Project without conducting a cumulative effects analysis.  This appeal is therefore not moot.

## II.  Likelihood of Success on the Merits

A preliminary injunction is an "extraordinary remedy" that requires the movant to show that:  (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm if the preliminary injunction is not granted; (3) the balance of equities tips in its favor; and (4) an injunction is in the public's interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008).  Here, the district court denied CC's motion for preliminary injunction on the basis that it had not established a probability of success on the merits as to its ESA claim.

The Administrative Procedure Act (APA), Pub. L. No. 79-404, 60 Stat. 237 (1946), sets forth additional requirements to be considered when deciding whether CC is likely to succeed on the merits as to its ESA claim.  *Earth Island Inst.*, 626 F.3d at 468.  Under the APA, a reviewing court may only set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "A decision is arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) (quotes omitted).  "Agency action is valid if the agency considered the relevant factors and articulated a rational

connection between the facts found and the choices made."
*Id.* (citation and quotes omitted). Moreover, when reviewing
scientific judgments and technical analyses within the
agency's expertise, the reviewing court must be at its "most
deferential." *Id.* (quoting *Balt. Gas & Elec. Co. v. Natural
Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)).

CC challenges the district court's determination that it has
not established a probability of success on the merits as to its
ESA claim on two grounds. First, CC asserts that the district
court committed legal error by disregarding the purported
requirement that the Forest Service perform a "cumulative
effects" analysis during its informal consultation with the
FWS. Second, CC claims that the district court committed
clear factual error by ignoring evidence controverting
Defendants' conclusion that the Mudflow Project would
"degrade" the Owl's critical habitat, but not result in an
adverse effect.

## A.  Cumulative Effects under ESA

The Forest Service prepared a biological assessment and
engaged in informal consultation with the FWS to evaluate
the potential effects of the Mudflow Project on the Owl and
its critical habitat. CC argues that Defendants violated the
procedural requirements of ESA section 7(a)(2) by "failing to
analyze the cumulative effects of [Defendants'] multiple
allowances of degradation of critical habitation through the
Mudflow Project and in connection with other past, present,
and future, nearby logging projects." This argument is
unavailing.

As a preliminary matter, CC's argument is premised on a
misunderstanding of the term "cumulative effects" in the ESA

context. The ESA defines "cumulative effects" as "those effects of *future State* or *private activities*, not involving Federal activities, that are reasonably certain to occur *within the action area* of the Federal action subject to consultation." 50 C.F.R. § 402.02 (emphasis added); *see also Medina Cnty. Envtl. Action Ass'n*, 602 F.3d at 694. Applied to the Mudflow Project, cumulative effects are those stemming from future state or private activities that are reasonably certain to occur within the Project area. This definition only pertains to ESA section 7 analyses and should not be conflated with NEPA's broader term "cumulative impact," which means "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7; *see also Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1183 (9th Cir. 2011).[6] Nor, contrary to CC's argument, is "cumulative impact" (or cumulative effects) a shorthand for "environmental baseline," which means "past and present impacts of all Federal, State, or private actions and other human activities in the action area. . . ." 50 C.F.R. § 402.02; *see also* ESA Handbook, at 4-22 (stating that cumulative impact captures "a 'snapshot' of a species' health at a specified point in time."). In sum, the terms "cumulative effects," "cumulative impact," and "environmental baseline" have distinct regulatory meanings under the ESA and NEPA.

---

[6] In this case, the Forest Service prepared a cumulative effects analysis of past, present, and reasonably foreseeable future actions under NEPA, but that fact is of no help to CC because its NEPA claim is not at issue in this appeal.

Moreover, CC complains that Defendants failed to analyze the cumulative effects of other nearby federal projects past, present, and future.  But consideration of federal projects, past projects, and projects outside the Mudflow Project area exceed the scope of a cumulative effects analysis, as defined under 50 C.F.R. § 402.02. Additionally, in conducting an analysis of the effects of the Mudflow Project on the Owl, the Forest Service considered past effects by incorporating them into the baseline it used for analysis.  Thus, the baseline already appears to account for the aggregate effects of past activities, while future federal and private actions must withstand independent regulatory scrutiny.  In essence, CC demands that Defendants conduct a more extensive, NEPA-like cumulative impacts analysis. But NEPA and ESA call for different regulatory review, and we must defer to the procedural mechanisms established by the implementing agency.  *See Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." (citations and quotes omitted)).

CC's argument also fails because there is simply no statutory mandate to consider cumulative effects during informal consultation.  We must uphold any reasonable interpretation agencies give to ambiguous statutes they are charged with administering.  *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842–44 (1984). Here, Congress has not "directly spoken" to the issue of whether a cumulative effects analysis is required during informal consultation under ESA section 7(a)(2).  *Id.* at 842. The statute only requires "consultation" with the appropriate

agency.  16 U.S.C. § 1536(a)(2).  Under its implementing regulations, FWS has clearly created an affirmative duty to consider cumulative effects during *formal* consultation, but there is no such duty during informal consultation.  The FWS's "responsibilities during formal consultation" include the formulation of a biological opinion that advises the action agency as to whether or not the action, "taken together with cumulative effects," 50 C.F.R. § 402.14(g)(4), is "likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat," 50 C.F.R. § 402.14 (h)(3).

In contrast, an informal consultation is defined as "an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative, designed to assist the Federal agency in determining whether formal consultation or a conference is required."  50 C.F.R. § 402.13(a).  Here, there is no mention of a cumulative effects analysis.  CC acknowledges as much, but provides no statutory or regulatory provision, legislative materials, or other relevant authority[7]—and we are aware of none—supporting a duty to evaluate cumulative effects during informal consultation.  In addition, we cannot—as CC requests—read section 402.13's failure to address cumulative

---

[7] CC relies on *Pacific Coast Federation of Fishermen's Associations, Inc. v. National Marine Fisheries Service*, 265 F.3d 1028 (9th Cir. 2001), and *National Wildlife Federation v. National Marine Fisheries Service*, 524 F.3d 917 (9th Cir. 2008), for the general proposition that consideration of cumulative effects under the ESA is crucial.  These cases are inapposite.  They concern challenges to a biological opinion prepared during *formal* consultation, and neither addressed the issue of whether an agency must consider cumulative effects of a proposed action during informal consultation.

effects as being equivalent to imposing a duty to analyze them, especially when read in juxtaposition with 50 C.F.R. § 402.14, which creates the duty expressly. *See Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 543; *Earth Island Inst.*, 626 F.3d at 472 ("Courts may not impose procedural requirements not explicitly enumerated in the pertinent statutes." (citation and quotes omitted)); *Wilderness Soc. v. Tyrrel*, 918 F.2d 813, 818 (9th Cir. 1990).

Likewise, in preparing its BA, the Forest Service was not required to consider cumulative effects under the ESA. The only relevant requirement is that a biological assessment "determine whether any [endangered] species or [critical] habitat are likely to be adversely affected by the action." 50 C.F.R. § 402.12(a). The contents of a biological assessment are at the "*discretion*" of the federal agency, "depend on the nature of the Federal action," and "*may*" include on-site inspections of the affected area, experts views, literature reviews, and analysis of alternate actions, as well as "consideration of cumulative effects, and the results of any related studies." 50 C.F.R. § 402.12(f) (emphasis added); *see also Medina Cnty. Envtl. Action Ass'n*, 602 F.3d at 699–700; *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1216 (9th Cir. 2004). Thus, under the plain meaning of 50 C.F.R. § 402.12(f), consideration of cumulative effects is permissive, not mandatory. The district court correctly determined that the Forest Service did not abuse its discretion in failing to consider a factor that it was not required to consider in the first place.

## B. Evidence Controverting Defendants' Conclusion that the Mudflow Project Is Not Likely to Adversely Affect the Owl

The district court also found that CC failed to show Defendants acted arbitrarily and capriciously in determining that the contemplated degradation from the Mudflow Project would not amount to an "adverse" effect.  CC argues that the district court abused its discretion by ignoring contrary evidence in FWS's own concurrence letter regarding proposed treatments.

First, CC observes that proposed treatments in the Owl's foraging habitat include thinning 22 acres to a basal area of 100–120 square feet per acre, whereas a basal area of 125–150 square feet per acre (or more) is needed to sustain the Owl's foraging habitat.  But CC ignores the fact that no single criterion determines the quality of foraging habitat.  The Owl's foraging habitat is a variegated landscape that primarily functions to provide food supply for survival and reproduction.  73 Fed. Reg at 47346.  Assessing the Owl's foraging habitat involves considering various forest structural features and elements, such as canopy cover, tree size, basal area, tree species composition, canopy layering, presence of edges and small openings, landscape position, slope position, distance to water, and proximity to nesting/roosting habitat, among others.  *See id.*  In its concurrence letter, the FWS concludes that "[c]onsistent with the high degree of variability described in research publications, [its] criteria for evaluating foraging habitat for spotted owls consists of a *range of stand conditions frequently used by owls* rather than a single threshold value."  Basal area is thus only one factor in the calculus.  The FWS further states that although most studies suggest some degree of Owl preference for higher

basal areas (160–220 square feet per acre), a substantial amount of foraging (44 percent) occurs within stands with basal areas ranging from 80–160 square feet per acre.

It is unclear, therefore, from the totality of the factors considered, that a thinning of 22 acres, out of a total of 408 acres of the Owl's degraded foraging habitat, to a basal area of 100–125 square feet per acre would necessarily mean that the Owl's total foraging habitat would be "adversely" modified—which, in the regulatory context, means appreciably diminished. *See Butte Envtl. Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 948 (9th Cir. 2010) ("[A]n adverse modification occurs only when there is a direct or indirect alteration that *appreciably diminishes* the value of critical habitat" (citation and quotes omitted)); ESA Handbook, at 4-35 (defining "adverse modification" as "a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species"). Even completely destroying 22 acres of critical habitat does not necessarily appreciably diminish the value of the larger critical habitat area. *See Butte Envtl. Council*, 620 F.3d at 948 ("An area of a species' critical habitat can be destroyed without appreciably diminishing the value of a critical habitat for the species' survival or recovery.").

Second, CC notes that the proposed treatments also include 46 acres of fuelbreak treatment. CC argues that 22 acres of thinning with sanitation, together with 46 acres of shaded fuelbreak treatment (totaling 68 acres of treated area), equals an "adverse effect." But again, "adverse" effect is a technical term referring to effects that appreciably diminish habitat value. *See Butte Envtl. Council*, 620 F.3d at 948. CC fails to explain how the alteration to 68 acres of the Owl's

foraging habitat will appreciably diminish the Owl's broader foraging habitat.  The Forest Service found that the Mudflow Project would not "downgrade" (temporarily reduce habitat functioning) or "remove" (render no longer functional) any part of the Owl's critical habitat.  The Forest Service further found that neither the Owls nor their nesting/roosting areas would be affected.  Only portions of the Owl's foraging habitat would be "degraded."  Given the totality of the findings, Defendants reasonably concluded that the Mudflow Project "may affect, but is not likely to adversely affect" the Owl or its critical habitat.  Under the APA's deferential standard of review, agency action is presumed to be valid if there is a reasonable basis for the decision. *Lands Council*, 629 F.3d at 1074.  Therefore, the district court did not abuse its discretion in deferring to Defendants' determination that the Mudflow Project would not likely adversely affect the Owl or its critical habitat, thus obviating the need for formal consultation.

## CONCLUSION

CC's challenge to the district court's denial of its preliminary injunction is premised on a misunderstanding of regulatory terms, an unsupported reading of a duty to consider cumulative effects under ESA section 7(a)(2), and selected portions of the record taken out of context.  The district court's decision is affirmed.

**AFFIRMED.**