**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALLIANCE FOR THE WILD ROCKIES,
      *Plaintiff-Appellant,*

            v.

JIM PENA, in his official capacity as
Regional Forester of Region Six U.S.
Forest Service; UNITED STATES
FOREST SERVICE, an agency of the
United States; RODNEY SMOLDON, in
his official capacity as Supervisor of
the Colville National Forest,
            *Defendants-Appellees,*

            and

STEVENS COUNTY; NORTHEAST
WASHINGTON FORESTRY COALITION;
PEND OREILLE COUNTY,
      *Intervenor-Defendants-Appellees.*

No. 16-35856

D.C. No.
2:16-cv-00294-
RMP

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Rosanna Malouf Peterson, District Judge, Presiding

Argued and Submitted June 13, 2017
Seattle, Washington

Filed August 1, 2017

Before:  DOROTHY W. NELSON, MILAN D. SMITH, JR., and MORGAN B. CHRISTEN, Circuit Judges.

Opinion by Milan D. Smith, Jr.

## SUMMARY[*]

### Environmental Law / Preliminary Injunction

The panel affirmed the district court's denial of a preliminary injunction in an action challenging the North Fork Mill Creek A to Z Project in the Colville National Forest in Washington.

The A to Z Project is a forest restoration project, and the Alliance for the Wild Rockies filed an action challenging the United States Forest Service's decision to approve the A to Z Project.

The panel held that Alliance had not demonstrated serious questions, much less a likelihood of success, with respect to any of its National Forest Management Act ("NFMA") and National Environmental Policy Act ("NEPA") claims.  The panel concluded, therefore, that the district court did not abuse its discretion in denying Alliance's motion for a preliminary injunction.

Specifically, the panel held that the Alliance had not shown either serious questions or a likelihood of success on

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

the merits of its NFMA or NEPA claims: based on the Forest Service's use of "habitat as a proxy" approach for assessing the viability of the pine marten; based on the Forest Service's use of the "proxy-as-proxy" approach for assessing the viability of the fisher; based on the Forest Service's snow-intercept cover analysis; and based on the Forest Service's open road density analysis. The panel also held that the Alliance had not shown either serious questions or a likelihood of success on the merits of Alliance's NEPA claim based on the Forest Service's sediment analysis.

## COUNSEL

Thomas John Woodbury (argued), Boise, Idaho, for Plaintiff-Appellant.

Rudy J. Verschoor (argued) and Vanessa R. Waldref, Assistant United States Attorneys; United States Attorney's Office, Spokane, Washington; for Defendants-Appellees.

Lawson Emmett Fite (argued), American Forest Resource Council, Portland, Oregon, for Intervenor-Defendants-Appellees.

## OPINION

M. SMITH, Circuit Judge:

Alliance for Wild Rockies (Alliance) appeals the district court's denial of a preliminary injunction in an action regarding the North Fork Mill Creek A to Z Project (A to Z Project) in the Colville National Forest in Colville, Washington. Alliance alleges that United States Forest

Service (Forest Service) violated the National Forest Management Act (NFMA) and the National Environmental Policy Act (NEPA) when it approved the A to Z Project. The district court concluded that Alliance did not satisfy any of the four required factors for the issuance of a preliminary injunction. We affirm.

## BACKGROUND

## I.  Statutory Schemes

### A.  NFMA

NFMA, 16 U.S.C. § 1600 *et seq*., requires the Forest Service to develop and implement land and resource management plans (forest plans) for each national forest. 16 U.S.C. § 1604(a).  "These plans operate like zoning ordinances, defining broadly the uses allowed in various forest regions, setting goals and limits on various uses (from logging to road construction), but do not directly compel specific actions, such as cutting of trees in a particular area or construction of a specific road." *Citizens for Better Forestry v. U.S. Dep't of Agric*., 341 F.3d 961, 966 (9th Cir. 2003).  Of particular relevance to this appeal, forest plans must, among other substantive requirements, (1) "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area," 16 U.S.C. § 1604(g)(3)(B), and (2) "insure that timber will be harvested from National Forest System lands only where . . . protection is provided for streams, streambanks, shorelines, lakes, wetlands, and other bodies of water from detrimental changes in water temperatures, blockages of water courses, and deposits of sediment, where harvests are likely to seriously and adversely affect water conditions or fish habitat." *Id.* § 1604(g)(3)(E)(iii). "After a forest plan is developed, all subsequent agency action, including site-

specific plans . . . , must comply with NFMA and the governing forest plan." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009).

## B. NEPA

NEPA, 42 U.S.C. § 4321 *et seq.*, "is a procedural statute intended to ensure environmentally informed decision-making by federal agencies." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1045 (9th Cir. 2013) (quoting *Tillamook Cty. v. U.S. Army Corps of Eng'rs*, 288 F.3d 1140, 1143 (9th Cir. 2002)). NEPA requires agencies to take a "hard look" at the environmental consequences of proposed agency actions before those actions are undertaken. *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004). However, "NEPA does not mandate particular substantive results, but instead imposes only procedural requirements." *Cold Mountain v. Garber*, 375 F.3d 884, 892 (9th Cir. 2004) (citations and internal quotation marks omitted).

Pursuant to NEPA's implementing regulations, the agency proposing the action may prepare an environmental assessment (EA) to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement [(EIS)] or a finding of no significant impact [(FONSI)]." 40 C.F.R. § 1508.9(a)(1). An EA is a "concise public document" that "[s]hall include brief discussions of the need for the proposal, . . . alternatives, . . . the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." *Id*. § 1508.9(b). "If the EA reveals that the proposed action will significantly affect the environment, then the agency must prepare an EIS." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1067 (9th Cir. 2002). But,

"[i]f the EA reveals no significant effect, the agency may issue a [FONSI]." *Id.*

## II.  The A to Z Project

The A to Z Project is a forest restoration project that encompasses 12,802 acres within the Colville National Forest, which is managed in accordance with the Colville National Forest Land and Resource Management Plan (Colville Forest Plan).  The A to Z Project is generally comprised of commercial timber harvest treatments, road maintenance, stream restoration, and culvert replacements. The commercial timber harvest treatments include commercial thinning, shelterwood harvest, and aspen restoration, with the goals of increasing tree diversity, improving stand productivity and wildlife habitat, and reducing the severity of insect, disease, and wildfire threats. The project was the result of a multi-year collaboration among elected officials, environmental organizations, Native American tribes, the timber industry, and community organizations.

The Forest Service is empowered to "enter into stewardship contracting projects with private persons or other public or private entities to perform services to achieve land management goals for the national forests and the public lands that meet local and rural community needs." 16 U.S.C. § 6591c(b).  Pursuant to this authority, the Forest Service offered the A to Z Project to private contractors as a stewardship contract.  Rodney D. Smoldon, the Forest Supervisor for the Colville National Forest, explained that "[t]he intent of this contract [was] to manage a piece of the Colville [National Forest] system lands from the planning stage through completion of all product removal and service work activities."  Pursuant to the proposal, the successful bidder would be responsible for hiring and funding a private

contractor to perform the required NEPA analysis of the A to Z Project.

The Forest Service officially solicited proposals from the public for a contractor that would conduct all of the work required by the A to Z Project, but only a single bidder, Vaagen Brothers Lumber, submitted a proposal. Vaagen Brothers Lumber was awarded the contract, and it hired Cramer Fish Sciences to perform the NEPA analysis of the A to Z Project.

Cramer Fish Sciences prepared the EA, which was reviewed and approved by the Forest Service. On March 11, 2015, the Forest Service released the EA for public comment. The Forest Service subsequently retracted and revised the EA to address concerns raised by the public, and issued the final EA on February 16, 2016. On June 13, 2016, Smoldon signed the FONSI and Decision Notice approving the A to Z Project.

## III.    Procedural History

On August 18, 2016, Alliance filed this lawsuit challenging the Forest Service's decision to approve the A to Z Project. On September 6, 2016, Alliance filed a Motion for a Preliminary Injunction with the district court. Stevens County, Pend Oreille County, and the Northeast Washington Forestry Coalition subsequently intervened as defendants.

On October 14, 2016, the district court held a hearing on Alliance's motion. After hearing from all parties, the district court handed down an oral decision denying Alliance's Motion for a Preliminary Injunction. The district court subsequently issued a written decision memorializing its ruling. In particular, the district court found that (1) Alliance failed to demonstrate a likelihood of success or "serious

questions" going to the merits of its NFMA and NEPA claims, (2) Alliance's allegations of harm were "too speculative to demonstrate a concrete and particularized harm that creates an irreparable injury," (3) the balance of the equities weighed against an injunction because of the A to Z Project's intended environmental benefits and current impact on the local economy, and (4) public interest also weighed against an injunction for the same reasons. On October 17, 2016, Alliance timely appealed.

## STANDARD OF REVIEW

"We review the denial of preliminary injunctive relief for abuse of discretion." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014). A district court abuses its discretion when it "base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.* (quoting *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 944 (9th Cir. 2013)).

"Because NFMA and NEPA do not provide a private cause of action to enforce their provisions, agency decisions allegedly violating NFMA and NEPA are reviewed under the Administrative Procedure Act ('APA')." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005). Under the APA, agency action is unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "An agency action is arbitrary and capricious 'only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Defs. of Wildlife v. Zinke*, 856 F.3d

1248, 1257 (9th Cir. 2017) (quoting *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013)).

## ANALYSIS

A party seeking a preliminary injunction must meet one of two variants of the same standard.  Under the original *Winter* standard, a party must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Under the "sliding scale" variant of the *Winter* standard, "if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

For the reasons explained below, we conclude that Alliance has not demonstrated serious questions, much less a likelihood of success, with respect to the merits of any of its NFMA and NEPA claims.  We therefore conclude that the district court did not abuse its discretion in denying Alliance's motion for a preliminary injunction.  We examine each of Alliance's claims in turn.[1]

---

[1] Alliance's complaint asserts an additional claim that the bidding procedure used by the Forest Service to award the A to Z Project stewardship contract to Vaagen Brothers Lumber violated Section 472a

## I.  Mixed NFMA and NEPA Pine Marten and Fisher Claims

Alliance first contends that the EA violated the Colville Forest Plan by using "failed" proxy analyses to conclude that A to Z Project would not significantly impact the viability of the pine marten and the fisher.  Alliance argues that the use of these "failed" proxy analyses does not constitute the requisite "hard look" required by NEPA, and that the Forest Service additionally violated NEPA by failing to prepare an EIS to evaluate the impact of the A to Z Project on the viability of the pine marten and the fisher.

### A.  Pine Marten

The Colville Forest Plan designated the pine marten as a management indicator species[2] for furbearers who inhabit mature conifer forests.  The Colville Forest Plan then set the following goal, measured as "core areas," for preserving the pine marten's habitat: "[e]very 2 to 2 ½ miles, provide units of at least 160 acres of conifer timber in successional stages VI (old growth), or V (mature) where stage VI is not currently available."  The EA explained that 24 pine marten core areas, totaling 1,950 acres, and 217 acres of stage VI trees were located within the A to Z Project area, but that neither the core areas nor the stage VI trees were marked for

of NFMA.  Alliance raised this claim before the district court, and briefed this claim on appeal.  However, during oral argument, Alliance conceded this claim for the purposes of this appeal.  We therefore do not address this claim.

[2] "A species chosen as a management indicator species is used as a bellwether . . . for the other species that have the same special habitat needs or population characteristics."  *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 762 n.11 (9th Cir. 1996).

timber harvesting.  The EA also found that connectivity of the core areas would be preserved because no core area would be completely surrounded by harvest treatments.  The EA recognized that the A to Z Project would inevitably lead to some individual pine marten being displaced, injured, or killed by equipment or human activity, but concluded that because the A to Z Project would not impact the pine marten core areas and stage VI trees, there would be no impact on the viability of the pine marten population on the project site.

The EA's use of the pine marten's habitat as a proxy for the viability of the species itself is referred to as the "habitat as a proxy" approach.  *The Lands Council v. McNair*, 537 F.3d 981, 996–97 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter*, 555 U.S. at 20.  "[I]f the species is used as an indicator of the population of another species, it is [known as] a 'proxy-on-proxy' approach." *Friends of the Wild Swan*, 767 F.3d at 949.  Proxy approaches are permitted "where both the Forest Service's knowledge of what quality and quantity of habitat is necessary to support the species and the Forest Service's method for measuring the existing amount of that habitat are reasonably reliable and accurate." *Id.* (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1250 (9th Cir. 2005)). However, proxy approaches must "reasonably ensure[] that the proxy results mirror reality." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir. 2004) (internal quotation marks omitted).

Alliance concedes that the Forest Service possessed the requisite knowledge of the pine marten's habitat requirements on the basis of the Youkey Report, a 2012 report produced by the Colville National Forest that confirmed the accuracy of the habitat assumptions embodied by the Colville Forest Plan's pine marten core areas

standard.  Likewise, Alliance does not challenge the EA's identification of the pine marten's core areas and preferred stage VI trees within the A to Z Project site.  Instead, Alliance argues that the EA's "habitat as a proxy" analysis was unreliable because (1) the Colville Forest Plan requires monitoring of the pine marten population, but the Forest Service has failed to conduct monitoring of the pine marten since 1995, and (2) no pine marten have been spotted on the project site since 1995.  In making this argument, Alliance cites to *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 933 (9th Cir. 2010), where we explained that "[t]he proxy-on-proxy approach's reliability is questionable where the [management indicator species] is absent from the project area."

In response, we note first that the Colville Forest Plan does not require population monitoring of the pine marten. The Colville Forest Plan permits the Forest Service to monitor the pine martin through three methods: "[a]cres of suitable habitat in defined distribution; localized population *or* activity trends within specified areas."  (Emphasis added). Because the Forest Service was not required to conduct population monitoring of the pine marten pursuant to the Colville Forest Plan, the Forest Service's failure to do so since 1995 does not categorically preclude the Forest Service from applying the "habitat as a proxy" approach.  *Cf. Tidwell*, 599 F.3d at 933–34 ("[T]he Forest Service cannot reasonably argue that the proxy-on-proxy approach allows it to avoid separately monitoring sage grouse population trends, as sage grouse are its chosen [management indicator species].  This is especially true where, as here, the forest plan requires monitoring of the [management indicator species]." (internal citation omitted)).

Alliance's reliance on *Tidwell* is also misplaced. In *Friends of the Wild Swan v. Weber*, we clarified that the absence of the management indicator species on the project site does not necessarily invalidate a proxy analysis. 767 F.3d at 949. We explained that *Tidwell* invalidated the proxy analysis in that case "where there was no data indicating the presence of the species in the area, no suggestion there was difficulty monitoring the species, and a flaw in the Forest Service's methodology that further undermined the use of the habitat proxy approach." *Id.* We then upheld the use of a proxy approach in *Friends of the Wild Swan*, explaining that although "no [management indicator species] were actually detected in the relatively small project area," this was "likely due to monitoring difficulties." *Id.* at 949–50. We also noted that the plaintiff "[did] not level specific criticisms at the Forest Service's habitat methodology." *Id.*

The combination of factors present in *Tidwell* is similarly absent here. First, although there have been no pine marten sightings in the project area since 1995, the pine marten has been seen in other parts of the Colville National Forest. Second, the EA implicitly determined that there were difficulties monitoring the pine marten. The EA explained that "some . . . species may be comparatively easy to locate, [and] others may be difficult to detect due to their scarcity, mobility, behavior, or habitat use," and therefore, the EA would use either "surveys or habitat-based methods" to analyze the impact of the A to Z Project on these species. Because the EA then used a habitat-based method for the pine marten by identifying pine martin core areas through the Colville National Forest database, we can infer that the EA found pine marten to be a species that is "difficult to detect." Third, as described above, Alliance does not challenge the Forest Service's knowledge of the pine

marten's required habitat or the EA's identification of this habitat within the project site.  As such, the Forest Service's "habitat as a proxy" analysis was neither arbitrary nor capricious.  Accordingly, Alliance has not shown either serious questions or a likelihood of success on the merits of a NFMA or NEPA claim based on the Forest Service's use of the "habitat as a proxy" approach for assessing the viability of the pine marten.

### B.  Fisher

Because the fisher is a furbearer that inhabits the Colville National Forest, the EA used the habitat of the pine marten, the management indicator species for furbearers, to similarly conclude that the A to Z Project would not impact the viability of the fisher.  Alliance objects to this "proxy-on-proxy" approach on three grounds.  First, Alliance argues that because the "habitat as a proxy" approach for the pine marten is flawed for the reasons stated above, a "proxy-on-proxy" approach based on the pine marten is similarly flawed.  Second, Alliance argues that there have been no sightings of the fisher on the project site.  Third, Alliance argues that the pine marten is a flawed management indicator species for the fisher because fisher require larger ranges.

None of these arguments is availing.  The absence of fisher sightings on the project site has no bearing on the reliability of the "proxy-on-proxy" approach to determining the fisher's viability.[3]  Because the "proxy-on-proxy" approach uses a management indicator species "as an

---

[3] In any event, the record indicates that there were "at least two probable sightings of fisher" in other parts of the Colville National Forest.

indicator of the population of another species," *Friends of the Wild Swan*, 767 F.3d at 949, sightings of the management indicator species (the pine marten), not the absent species (the fisher), play a role in determining the reliability of the "proxy-on-proxy" approach. *See Tidwell*, 599 F.3d at 933–34. And for the reasons stated above, the absence of pine marten sightings on the project site does not invalidate the EA's "habitat as a proxy" analysis of the pine marten's viability; because the "proxy-as-proxy" approach is based upon the "habitat as a proxy" approach for the management indicator species, the absence of pine marten sightings does not invalidate the EA's "proxy-as-proxy" analysis for the fisher for the same reasons. In addition, although Alliance contends that fisher require larger ranges than pine marten, Alliance does not challenge the EA's conclusion that fisher prefer late and old structural stands. The EA's analysis, including the identification of 1950 acres of stage V trees and 217 acres of stage VI trees within the A to Z Project, adequately addresses and accommodates the fisher's preferred habitat within the project site. Alliance thus has not shown either serious questions or a likelihood of success on the merits of a NFMA or NEPA claim based on the Forest Service's use of the "proxy-as-proxy" approach for assessing the viability of fisher.

## II. Mixed NFMA and NEPA Big Game Habitat Claims

Alliance next contends that the A to Z Project violates the Colville Forest Plan's snow-intercept cover standard and open road density objective for big game habitat. Alliance argues that the Forest Service violated NEPA by failing to recognize the decrease in snow-intercept cover and the increase in open road density as significant environmental impacts and failing to prepare an EIS on these two issues.

## A. Snow-Intercept Cover

The Colville Forest Plan requires management activities to work towards a 50:50 cover-to-forage ratio in big game winter range to provide optimum forage use for big game species. The current cover-to-forage ratio for the big game winter range within the project site is 90:10. The EA concluded that the A to Z Project's harvesting activities would reduce the cover-to-forage ratio to 70:30, moving the ratio closer to the Colville Forest Plan's desired ratio.

Alliance faults this analysis on two grounds. First, Alliance cites to its own expert report, which opined that the harvesting activities would have a far greater negative impact by reducing the cover-to-forage ratio to 30:70. Second, Alliance contends that the EA failed to adhere to the recommendation from the 1993 Colville National Forest monitoring report to analyze snow-thermal cover in the entire winter range for big game, not just the two areas currently identified in Colville Forest Plan.

The conflicting conclusion proffered by Alliance's expert report does not demonstrate that the Forest Service's cover analysis was arbitrary or capricious. NFMA's implementing regulations require the Forest Service to "use the best available scientific information" in the forest planning process. 36 C.F.R. § 219.3 (imposing this standard on "the planning process required by [36 C.F.R. § 219] for assessment"); *id.* § 219.15(d) (requiring that "[a] project or activity approval document must describe how the project or activity is consistent with applicable plan components"). But even with this requirement, "it is not [the] role [of a reviewing court] to weigh competing scientific analyses." *Castaneda*, 574 F.3d at 659. A party challenging the Forest Service's scientific analysis cannot simply "cite studies that support a conclusion different from the one the Forest

Service reached" and must instead provide "scientific studies that indicate the Forest Service's analysis is outdated or flawed." *Id.*

The Forest Service made its cover-to-forage ratio calculations based on its Silviculture/Fire Specialist Report, which explained that commercial thinning "would be very light and homogenous through the harvest unit," would remove "[n]o more than 20 percent of the current volume," and would not create openings. In contrast, Dr. Sara Johnson, the expert upon whom Alliance relies, asserts, without explanation, that all logging activity in the A to Z Project will result in a loss of cover. Dr. Johnson's analysis, which is based on her prior experience as a Forest Service biologist in a different national forest, does not provide requisite "scientific information directly undermining" the analysis of the Silviculture/Fires Specialist Report. *Castaneda*, 574 F.3d at 660.

Nor did the Forest Service arbitrarily and capriciously decline to analyze snow-thermal cover in accordance with the recommendation from the 1993 monitoring report. In *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 973–74 (9th Cir. 2002), we held that the failure to implement a monitoring report recommendation was arbitrary and capricious because the monitoring report made an express finding that the Forest Plan was inadequate on that particular issue. But here, the 1993 monitoring report only *suggested* that the Colville Forest Plan standard for evaluating snow cover was inadequate: the 1993 monitoring report disclosed that "[m]onitoring results indicate that some revision of management direction *may be* needed" because "Forest Plan standards . . . prescribe specific minimum levels of snow intercept cover, which *may not be* realistic in all circumstances." (Emphasis added). The 1993 monitoring

report then recommended, as one "suggested solution," that snow-thermal cover be evaluated throughout the entire biological winter range.  In the absence of an express finding that the Colville Forest Plan's standard for evaluating snow-thermal cover is inadequate and must be remedied by adopting the 1993 monitoring report's recommendation, the Forest Service did not arbitrarily or capriciously decline to apply the 1993 monitoring report's recommendation of analyzing snow-thermal cover in the entire winter range.

In sum, Alliance has not shown either serious questions or a likelihood of success as to the merits of a NFMA or NEPA claim based on the Forest Service's snow-intercept cover analysis.

## B.  Road Density

The Colville Forest Plan establishes an open road density objective "of less than 1.5 miles of open road per square mile" on big game winter range.  The current open road density in the Colville National Forest already exceeds this objective at 1.9 miles of open road per square mile.  Alliance contends that the A to Z Project would add an additional 30 miles of new temporary roads, which will further increase the open road density's noncompliance with the Colville Forest Plan.  In the EA, the Forest Service concluded that the additional new temporary roads added by the A to Z Project would neither increase nor decrease the current level of open road density.

The Forest Service's conclusion was neither arbitrary nor capricious.  Only a small portion of the 30 miles of new temporary roads would be built on big game winter range, and all 30 miles would be decommissioned and subject to closure treatments as soon as the project activities end.  Accordingly, Alliance has not shown either serious

questions or a likelihood of success on the merits of a NFMA or NEPA claim based on the Forest Service's open road density analysis.

## III.      NEPA Sediment Claims

Alliance lastly contends that the Forest Service violated NEPA by making an arbitrary and capricious determination that sediment accumulation in streams within the project site resulting from the A to Z Project's activities was not a significant environmental impact.  Alliance raises three objections to the Forest Service's analysis: (1) that the Forest Service impermissibly found the sediment impact to not be "significant" because positive sediment reduction elements of the A to Z Project outweighed the negative sediment accumulation elements, (2) that the A to Z Project's sediment reduction measures do not occur in the same streams in which the sediment accumulation occurs, and (3) that the Forest Service did not consider the impact of grazing on sediment delivery.

First, while Alliance is correct that "[a] significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial" for NEPA purposes, 40 C.F.R. § 1508.27(b)(1), a federal agency may nevertheless "consider the effect of mitigation measures in determining whether preparation of an EIS is necessary." *Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir. 1993).  The Forest Service estimated that the A to Z Project's improvements and mitigation measures would result in a 0.5% net decrease in sediment delivery to streams from logging roads, but Alliance observes that the A to Z Project's logging and road usage would result in a 64.1% gross increase in sediment delivery.  Alliance contends that this drastic increase in sediment delivery will result in a fine

sediment level that exceeds the 25% threshold and thus pose a danger to fish egg survival.

However, Alliance's focus on the gross increase in sediment delivery overlooks the sequence in which activities impacting sediment delivery will occur. All of the road maintenance and reconstruction, which will result in a 64.7% decrease in sediment delivery, is scheduled to take place *before* the road construction, logging, and stream restoration activities, which will result in the 64.1% increase in sediment delivery. As explained by the Forest Service's Hydrology Report, "[t]he outcome from this sequence would be immediate benefit of the maintenance and reconstruction, followed by the effects of road construction, logging, hauling, and prescribed burning." Alliance's theory that the gross increase in sediment delivery will result in a fine sediment level that threatens fish egg survival fails for this reason. Because (1) the road rehabilitation and restoration works will first lower the total sediment delivery before any potential sediment delivery is increased by the A to Z Project activities, and (2) the net result is a 0.5% decrease in sediment delivery, the fine sediment rate is unlikely to increase from the current level of 23% and exceed the fish-threatening threshold of 25%. The Forest Service permissibly relied on both the benefit of a net sediment reduction and the specific sequence of sediment reduction followed by sediment increase to conclude that the A to Z Project's sediment accumulation activities would not create a significant environmental impact.

Alliance's contention that the A to Z Project's sediment reduction measures will not affect all areas of sediment accumulation is similarly unavailing. Alliance argues that the A to Z Project's five "hot spots" mitigation projects, which constitute 1.7 miles of road improvement, are located

downstream of roads that will generate sediment, and therefore will not mitigate the adverse impacts of increased sedimentation. However, mitigation measures "need not *completely compensate* for adverse environmental impacts" for an agency to rely upon them to find no significant environmental impact. *Friends of the Payette*, 988 F.2d at 993 (quoting *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 987 (9th Cir. 1985)). The Hydrology Report explained that "[i]n general, approximately one-third or less of total road system mileage has been found to contribute sediment to stream systems; conversely, two-thirds or more of road system mileage did not contribute." The five "hot spots" locations were thus chosen because they account for "nearly two-thirds of [the annual] sediment delivery" caused by existing roads, thereby presenting the "best sediment reduction opportunities." Moreover, Alliance ignores additional project-wide sediment mitigation measures which include the establishment of 300 feet buffers between timber harvesting and fish-bearing streams and road maintenance outside of the five "hot spots." The Forest Service's consideration of the A to Z Project's "hot spots" mitigation measures was neither arbitrary nor capricious.

Finally, the Forest Service expressly considered the potential sediment impact from grazing in the project site. The EA recognized that "[l]ivestock grazing would continue on NFS lands, with improved grazing practices that are intended to improve riparian conditions, stream habitat, and water quality." The EA additionally found that "the total amount of sediment introduced into stream systems as a result of ongoing livestock grazing of the 33 cow/calf pairs on the North Fork Mill, Strauss, and Rodgers pastures on NFS lands within the project area is expected to continue to decrease as grazing management allows riparian vegetation to become reestablished and any overgrazed areas to

recover." These conclusions are supported by the EA which analyzed and ultimately approved the Colville National Forest's proposal to authorize this grazing activity.

Accordingly, Alliance has not shown either serious questions or a likelihood of success on the merits of a NEPA claim based on the Forest Service's sediment analysis.

## CONCLUSION

For the foregoing reasons, we conclude that the district court did not abuse its discretion in concluding that Alliance failed to demonstrate either serious questions or a likelihood of success with respect to the merits of any of its NFMA and NEPA claims. Because a party seeking a preliminary injunction must satisfy all four factors under both the *Winter* and "sliding scale" standards for injunctive relief, *Cottrell*, 632 F.3d at 1135, we need not address the remaining three factors. The district court's denial of Alliance's motion for a preliminary injunction is therefore AFFIRMED. Alliance shall bear costs on appeal. Fed. R. App. P. 39(a)(2).